UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| MADISON CAPITAL COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) ) ) | Civil Action No. 07-27-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| TIMOTHY P. SMITH, | ) | **AND ORDER** |
| | ) | |
| Defendant/Counterclaim Plaintiff/Third-Party Plaintiff, | ) ) ) | |
| | ) | |
| AMERICAN MINING & MANUFACTURING CORPORATION; AMERICAN MINING, WEST LLC; AMERICAN ENGINEERING & CONSTRUCTION CORPORATION; and | ) ) ) ) ) | |
| | ) | |
| UNITED STATES COAL CORPORATION, | ) ) | |
| | ) | |
| Intervening Counterclaim Plaintiffs/ Third-Party Plaintiffs, | ) ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN MINING & MANUFACTURING and MADISON CAPITAL COMPANY, LLC, | ) ) ) | |
| | ) | |
| Third-Party Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

This case began with a debt collection action, which led to years of litigation attempting to enforce the judgment against the debtor-defendant, Timothy Smith. Madison Capital Company, LLC ("Madison Capital") filed a motion for contempt of court and for sanctions against Mr. Smith

and his attorney, Charles Greenwell. R. 326. Madison Capital alleges that Mr. Smith and Mr. Greenwell disregarded the Court's orders and transferred Mr. Smith's property to Mr. Greenwell. Because clear and convincing evidence shows that he violated the attachment order, the contempt motion is granted as to Mr. Smith. It is denied as to Mr. Greenwell.

## FACTUAL BACKGROUND

Madison Capital filed this action on February 7, 2007, to collect a debt Mr. Smith owed as a guarantor of a commercial loan. R. 1. In his answer, Mr. Smith filed counterclaims against Madison Capital for fraud, unjust enrichment, and breach of the covenants of good faith and fair dealing. R. 5. The Court granted summary judgment in favor of Madison Capital on March 13, 2008, for its claims. R. 64. At that time, the Court also issued an attachment order to prevent Mr. Smith from dissipating his assets. R. 64 ("attachment order").

On June 10, 2008, Mr. Smith filed for bankruptcy. R. 86. The bankruptcy court dismissed his filing a month later for failure to comply with that court's orders. R. 88.

Thereafter, on August 20, 2008, Mr. Smith's previous attorneys in this litigation (not Mr. Greenwell) filed a motion for leave to withdraw as counsel. R. 100. The Court granted Mr. Smith fourteen days to obtain new counsel or to respond to Madison Capital's motion for summary judgment on his counterclaims. *Id.* On September 5, 2008, Mr. Smith filed a motion for extension of time to obtain new counsel and respond to the motion for summary judgment. R. 106. The Court allowed Mr. Smith until October 17, 2008, and informed him that if he did not obtain new counsel or enter a response to Madison Capital's motion for summary judgment, that it would grant Madison Capital's motion without further notice to the parties. R. 107. (Madison Capital moved to vacate

2

this order, R. 108, and the Court denied that request and allowed Mr. Smith additional time to obtain counsel and respond to the motion for summary judgment, R. 175).

At the same time, on August 26, 2008, this Court entered a final judgment ordering Mr. Smith to pay $1.2 million plus interest, attorney fees, court costs, and collection expenses to Madison Capital. R. 105. Madison Capital then conducted discovery of Mr. Smith's assets. R. 175. Between August and October 2008, Madison Capital obtained numerous writs of execution and garnishment orders against Mr. Smith in an attempt to enforce the judgment. One of the many garnishment orders the clerk issued was a wage garnishment order on one of Mr. Smith's companies, Magic Coal Company ("Magic Coal"). R. 156 ("garnishment order").

On October 1, 2008, the United States Marshal served a writ of execution at Mr. Smith's home and at his office. Mr. Smith's attorney, Mr. Greenwell, was present and objected because most possessions were in the name of Mr. Smith's wife, Connie Smith. The parties had an emergency hearing before Magistrate Judge Edward Atkins. Judge Atkins allowed the Marshal to seize two vehicles in Mr. Smith's name and entered an order to prevent any future property transfers. R. 181 ("transfer order").

The orders mentioned above read as follows:

Attachment order, R. 64:

> An attachment is issued against all property and assets of Defendant, Timothy P. Smith, as security for a judgment obtained against him by the Plaintiff. Timothy P. Smith is prohibited from transferring, encumbering, concealing, or otherwise disposing of any of his property and assets.

Garnishment order, R. 156:

> Judgment Debtor:         Timothy P. Smith
> Judgement Creditor:     Madison Capital Company, LLC

3

>Garnishee (Employer):     Magic Coal Mining Company
>You are hereby (1) restrained from paying to the Judgment Debtor, or to anyone for him, money, property, or other evidence of debt in your possession belonging to him or in which he has any interest; and (2) ordered to continuously withhold and safely keep all of said nonexempt property of the Judgment Debtor until (a) the amounts due plus interest and costs are paid in full. . .

Transfer order, R. 181:

>Pending further order, the defendant shall not attempt to transfer, move or conceal, in any way, any real or personal property in an effort to avoid satisfaction of the plaintiff's judgment.

***The money transfer at issue:*** Mr. Smith is the president and sole shareholder of Magic Coal Company. R. 350 at 63. Sometime in early October 2008, Magic Coal received $161,434.85 of cashier's checks dated October 8, 2008, from Community Trust Bank. *See* R. 326, Ex. 4. Community Trust Bank transferred this money to Magic Coal in error. R. 350 at 26. It is undisputed that Mr. Smith transferred the entire amount to Mr. Greenwell. Mr. Greenwell deposited the money into his law firm's account and on October 17, 2008, entered an order of appearance in this case. R. 193. In a letter dated October 29, 2008, Mr. Greenwell confirmed his acceptance of a $160,000 retainer for the representation of Mr. Smith. R. 357, Ex. 6.

Madison Capital also sued Mr. and Mrs. Smith in the Western District of Kentucky, in an effort to void Mr. Smith's transfer of assets to Mrs. Smith. *See Madison Capital Co., LLC, v. Smith*, No. 08-CV-382-JGH (W.D. Ky. Mar. 4, 2009). Mr. Greenwell represented the Smiths in that action beginning in August 2008, before he represented Mr. Smith in the Eastern District. After a bench trial, the Western District issued a $1.2 million judgment against Mrs. Smith on March 4, 2009. *See id.* at R. 54.

4

A week later, Mr. and Mrs. Smith filed for bankruptcy again. R. 277. At the first meeting with Mr. Smith's creditors on April 23, 2009, Madison Capital learned of the October 2008 transfer of funds from Community Trust Bank to Magic Coal and then to Mr. Greenwell. R. 326, Ex. 5. After a three-day trial, the bankruptcy court dismissed that case because of the Smiths' bad faith and their inability to propose a confirmable plan of reorganization. R. 326, Ex. 6. The bankruptcy court also found Mr. Smith had a habit of lying under oath, and that he had likely violated this Court's orders. *See id.* at 16.

Mr. Smith's counterclaims in the instant case against Madison Capital are currently set for jury trial on April 6, 2010. R. 313. Madison Capital still has dozens of writs and orders placed on Mr. Smith's property in an attempt to collect the October 2008 judgment.

## CONTEMPT MOTION

On December 4, 2009, Madison Capital filed a motion for contempt of court and for sanctions against Mr. Smith and his attorney, Mr. Greenwell. *See* R. 326. Madison Capital alleges that Mr. Smith and Mr. Greenwell violated the Court's orders by transferring $161,434.85 of Magic Coal's cashier's checks from Magic Coal to Mr. Smith to Mr. Greenwell. Madison Capital asks the Court to disgorge the $161,434.85 to Madison Capital and to dismiss Mr. Smith's counterclaims. According to Madison Capital, Mr. Smith admits he distributed the property to himself and then used it for his own personal expense. *See* R. 326 at 6. Mr. Greenwell obtained counsel, R. 332, and responded separately that he lacked actual knowledge of the orders, R. 337. In his response, Mr. Greenwell argues that since Mr. Smith did not violate the orders, he could not aid Mr. Smith in doing so. *See* R. 337. Mr. Smith believes the checks were always Magic Coal's corporate property and not his own. R. 338.

On January 20, 2010, the Court held a hearing on the contempt and sanction issues. *See* R. 350, transcript of hearing ("Tr."). Following the hearing, the parties submitted supplemental briefing on the issue of the garnishment order and appropriate sanctions. Neither of the defendants significantly changed his arguments. *See* R. 356 and R.358. Madison Capital explains that Mr. Smith's indorsement of the checks turned them into cash, which then became the personal property of Mr. Smith. R. 357. Mr. Greenwell, R. 364, and Mr. Smith, R. 365, again replied reiterating their arguments.

## DISCUSSION

Since 2008, Mr. Smith has made no effort to pay the judgment he owes to Madison Capital. In fact, it seems he has done everything possible to circumvent the Court's rulings. Despite that, this motion focuses only on Magic Coal's $161,434.85 of cashier's checks and whether Mr. Smith violated the Court's orders by indorsing them to Mr. Greenwell. For the Court to hold Mr. Smith in contempt, Madison Capital "must produce clear and convincing evidence that shows that 'he violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order.'" *Elec. Workers Pension Trust Fund of Local Union No. 58 v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 379 (6th Cir. 2003) (quoting *N.L.R.B. v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 591 (6th Cir. 1987)). Madison Capital has shown that Mr. Smith, not Magic Coal, transferred the money to Mr. Greenwell. Thus, Mr. Smith violated at least the attachment order, and the Court finds him in contempt.

**I. Mr. Smith's violation of the attachment order**

The attachment order prohibits Mr. Smith from transferring any of his assets or property before paying the judgment to Madison Capital. R. 64. Thus, Madison Capital must show by clear

6

and convincing evidence that Mr. Smith, in his individual capacity, had possession of the cashier's checks. Community Trust Bank distributed the $161,434.85 cashier's checks to Magic Coal, at which point the checks were corporate property. R. 326, Ex. 4. Mr. Smith indorsed the checks not personally, but as "President Magic Coal Co." *Id.* Even though he is the president and sole shareholder of Magic Coal, he does not own Magic Coal's property. *Olympic Forest Prods., Ltd. v. Cooper*, 148 F. App'x 260, 263 (6th Cir. 2005) ("The law treats a corporation as an entirely separate entity from its stockholders, even where only one person owns all the corporation's stock." (citing *Foodland Dist. v. Al-Naimi*, 559 N.W.2d 379 (Mich. App. 1996))). Several facts, however, prove Mr. Smith converted Magic Coal's cashier's checks into his personal property.

First and most importantly, Mr. Smith admitted that he distributed the funds to himself and that he put them to personal use. Mr. Smith testified as follows at his April 2009 bankruptcy creditors' meeting:

> A: . . . When – if those were issued to Magic, and Magic distributed those then to me, I don't know how that flows. . .
> Q: And that money was used to fund legal expenses in this lawsuit's – is that correct – for your personal benefit?
> A: Well technically, it was distributed to me. And then, you know, I – thats exactly what I used . . .
> Q: . . . So you view this that Magic Coal transferred it to you, and then you gave it to Mr. Greenwell, right?
> A: That's correct.

R. 326, Ex. 5 at 62, 66-67. In addition, Bankruptcy Judge David Stosberg was present at this hearing and his view of this testimony further supports the finding that Mr. Smith converted these funds for his own personal use. Judge Stosberg stated that Mr. Smith "made a direct disbursement to himself by indorsing checks over to Mr. Charles Greenwell ('Greenwell') for the purpose of representing Mr. Smith in the Eastern District Litigation. This distribution violated Mr. Smith's

7

fiduciary duty to the creditors of Magic Coal and directly violated the March 13 Order and the September 19 Garnishment Order entered by the Eastern District Court." R. 326, Ex. 6 at 5-6.

Until recently, Mr. Smith did not dispute that he distributed the funds to himself. Mr. Smith recanted these admissions at the contempt hearing. These clarifications were not credible. *See* Tr. at 75. Mr. Smith testified that he believed the checks were "not [his] money, that [he] could not go and deposit that check in [his] account, that Community Trust wouldn't allow [him] to do that as an individual, that that was the corporation's money. And it had to be either signed over as the corporation or it had to be deposited in a Magic Coal Company checking account, is the only options." *Id.* at 70. When asked, Mr. Smith failed to explain his prior inconsistent statement. He simply stated that he was previously mistaken. *Id.* at 75. This explanation defies logic. Mr. Smith took the checks and testified afterwards that he did so in his individual capacity and used them for his personal expense. Stating now that he was mistaken cannot change what actually transpired. Mr. Smith changed his testimony to fit the situation; at the contempt hearing he had a strong incentive to testify that the property belonged to Magic Coal and was transferred directly to Mr. Greenwell. The Court viewed this testimony and simply did not find it credible.

Other judges have similarly found Mr. Smith's testimony and filings to be disingenuous. Mr. Smith's first bankruptcy proceeding was dismissed because Mr. Smith failed to follow the bankruptcy court's orders. R. 88. In the second bankruptcy proceeding, Judge Stosberg dismissed the bankruptcy, in part, based on a finding of the Smiths' bad faith. R. 326, Ex. 6 at 19. Judge Stosberg held that Mr. Smith had a "'habit' of not being truthful or providing full disclosure to the Court." *Id.* at 16. The opinion lists other instances where Mr. Smith admitted to inaccurate sworn statements, and admitted to erroneous sworn schedules. "During the course of the trial, Mr. Smith

8

repeatedly contradicted earlier testimony." *Id.* Mr. Smith's hearing testimony that the money moved directly from Magic Coal to Mr. Greenwell is not credible. Further, Mr. Smith's own actions contradict his later statements that it "was the corporation's money" because Mr. Smith *did* treat the checks as his personal funds in direct contradiction of his testimony.

Beyond Mr. Smith's damaging admission, other evidence shows that he possessed the funds in his individual capacity. Mr. Smith initially took possession of Magic Coal's cashier's checks as the company's president. Yet, rather than deposit the checks in Magic Coal's account, Mr. Smith signed the back of the cashier's checks, turning them into a cash equivalent.[1] This was not an ordinary business practice. Under Kentucky law, a person can transfer the ownership of an indorsed check just by giving it to another person. R. 357 at 8; *see* Ky. Rev. Stat. § 355.3-205. In essence, that is what Mr. Smith did when he signed the check—he transferred the check from Magic Coal to himself *before* transferring it to Mr. Greenwell. The fact that Mr. Smith immediately converted the cash to personal use also supports the finding that Mr. Smith took personal possession of the cash. Magic Coal as a corporation had little reason to act in such a bizarre manner in order to transfer the check to Mr. Greenwell.

---

[1] Mr. Smith argues that his signature as an officer in a representative capacity does not open him to personal liability. R. 358 at 5 (citing Ky. Rev. Stat. § 355.3-402). Of course, this is true in ordinary corporation law. For example, if Mr. Smith were paying a debt of Magic Coal by signing one of its checks, the corporation, not the officer in his individual capacity, would be liable if the check was returned for insufficient funds. Here, however, this principle has no bearing. Magic Coal has not defaulted on a debt or written a check with insufficient funds; rather, Mr. Smith converted the checks to his personal use, and then violated a court order. Section 355.3-402 does not apply and does not protect Mr. Smith in this instance. In other words, Mr. Smith is not liable for his actions as an officer of Magic Coal, he is liable for his actions in his individual capacity.

9

The parties do not dispute that the funds were transferred to Mr. Greenwell as a retainer to serve as counsel for Mr. Smith. This shows that Mr. Smith put the funds to his own personal use. Magic Coal is not a party to this litigation, nor has Mr. Greenwell ever represented Magic Coal. Mr. Smith argues that Magic Coal made the business decision to pay his legal fees in the best interest of the company. Tr. at 70-72. But the way Magic Coal made the payment shows otherwise. It did not do so in the ordinary course of business. Generally, when paying a bill, a corporation makes a deposit, and then writes a separate check for the amount of the bill or fee. Here, Magic Coal (through Mr. Smith) suddenly acquired $161,434.85, and immediately turned over that exact amount to Mr. Greenwell as a retainer. This is no coincidence. It shows that the first chance a sum of money became available, Mr .Smith appropriated it for his own personal benefit. When asked at the hearing how much Mr. Greenwell charged as a retainer previously, Mr. Smith agreed that "[t]here was no outstanding request by Mr. Greenwell and his firm" for Mr. Smith to pay that precise amount, "that just happened to be the total amount of checks." *Id.* at 94. Thus, the record does not explain why in October 2008, exactly $161,434.85 became the cost of Mr. Greenwell's legal counsel. No one claims that the retainer was exactly $161,434.85. Moreover, the letter from Mr. Greenwell after receiving these checks states that he has taken $160,000 as the retainer. R. 357, Ex. 6. It is illogical to think a corporation would pay more than what is due for someone else's legal fees. If Magic Coal was truly paying the retainer, and the retainer was actually $160,000, it would have deposited the cashier's checks and then written Mr. Greenwell a check for $160,000. This bizarre way of paying the bill indicates that the transfer was anything but ordinary corporate practice. Rather, it was clearly an attempt by Mr. Smith to avoid the orders of this Court.

Mr. Smith argues that the Court's order to hire new counsel forced him to find the money anywhere that he could. R. 365 at 4. But Mr. Smith's argument about his desperation only adds to the mounting evidence that Mr. Smith, not Magic Coal, transferred the money to Mr. Greenwell. The Court also gave Mr. Smith almost two months, a reasonable amount of time, to acquire new counsel or in the alternative represent himself. *See* R. 107. Mr. Smith's admission that he distributed the money to himself, combined with his appropriation of it for his own personal use, shows that he ultimately possessed the checks personally and not as the president of Magic Coal.

The wand of contempt should be waved only in rare situations. The Supreme Court, however, "has stated that this power 'is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it they are mere boards of arbitration, whose judgments and decrees would be only advisory.'" *Elec. Workers*, 340 F.3d at 378 (*quoting Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911)). By possessing the checks personally and then transferring them to Mr. Greenwell, Mr. Smith directly violated the definite and specific terms of the attachment order. Thus, Madison Capital's motion for contempt is granted. Mr. Smith argues repeatedly based on *United States v. Saccoccia* that the Court cannot go beyond the plain language of an order to hold an individual charged with violating the order in contempt. 433 F.3d 19, 27-30 (1st Cir. 2005); R. 358 at 7-8; R. 365 at 2. But the Court does not go beyond the attachment order's plain language; Mr. Smith was clearly prohibited from transferring any of his personal property. *See* R. 64. Because Mr. Smith violated the attachment order, the Court need not decide whether he also violated the transfer or garnishment orders.

11

**II. Mr. Greenwell did not violate the Court's orders**

Madison Capital also asks the Court to hold Mr. Smith's attorney, Mr. Greenwell, in contempt for his acceptance of the checks from Mr. Smith. R. 326 at 8-10. This part of the motion is denied. A court's orders can bind the parties listed in them, as well as those parties' attorneys. However, "[t]he order binds only the following who receive **actual notice** of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys . . ." See Fed. R. Civ. P 65(d)(2) (emphasis added). The Supreme Court interpreted this rule to mean "[i]n essence it is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945).

To meet the burden of proving actual notice of the order, Madison Capital must prove that Mr. Greenwell reviewed the orders at some point before receiving the checks. Since there is no clear and convincing evidence that he did, he is not in contempt. "For a party to be held in contempt, it must have violated a clear and unambiguous order that left no reasonable doubt at to what behavior was expected . . . In determining specificity, the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden." *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 17 (1st Cir. 1991) (citations omitted). General knowledge of the effects of a court's order does not meet this incredibly high standard; the parties clearly have to know the specific words of the order.

Mr. Greenwell testified at the contempt hearing that he did not have knowledge of the detail of any of the specific orders concerning Mr. Smith's property. Tr. at 101 ("If I looked at prior orders, I did not look at them in the detail you imply. It was simply–I think there was some review

of dockets, the docket references. And the case was voluminous."). Given the sequence of events, this is entirely plausible. The attachment order was issued on March 13, 2008. R. 64. Mr. Greenwell did not represent the Smiths in any capacity at that time. Mr. Greenwell became involved in the Smiths' Western District litigation on August 27, 2008. Tr. at 95. Madison Capital argues that when he took over the Western District litigation, Mr. Greenwell must have reviewed the existing orders from the Eastern District litigation. While working on the Western District case, Mr. Greenwell spent many hours going through boxes of transactional records. Tr. at 96-98 ("I did not have the orders and the pleadings. I – the only thing I had really initially was the transactional documents and the documents filed in the Western District."). Having reviewed the billing records *in camera*, the Court found no evidence that Mr. Greenwell reviewed the attachment order. R. 349. There is no evidence that he had actual notice of the specific terms of the attachment order.

Mr. Greenwell admits that he had a general sense that Mr. Smith was not supposed to transfer property. However, Mr. Greenwell argues that his general knowledge does not meet the contempt standard for a non-party to an order. He is correct. He testified: "I don't think there was ever any—any doubt that Mr. Smith could not use personal property." Tr. at 104-05. When pressed about a letter he received dated October 8, 2008, from Madison Capital, which explained that Mr. Smith's assets were encumbered by court order, Mr. Greenwell stated that he was "not disputing the fact Mr. Smith could not transfer his personal assets." *Id.* at 111-12. He further admitted that in October 2008, he knew that no personal transfers of Mr. Smith's property were allowed. *See id.*

Finally, Madison Capital argues that an attorney cannot blindly accept payment when the source of the funds is suspect. R. 326 at 9 (citing *In re Bell & Beckwith*, 838 F.2d 844, 849 (6th Cir. 1988) ("for if the totality of the circumstances surrounding the conveyance of the assets given to [the

13

attorney] aroused suspicion, [the attorney] should have inquired as to the source of the property he received.")). Mr. Greenwell had a responsibility, based on the history of this case, to inquire into where Mr. Smith received the funds. Mr. Greenwell confirmed that Magic Coal was a corporation in good standing with the Secretary of State's Office, that it was not a party to this or any other known litigation, and that it was a viable operating mining entity. R. 337 at 6; R. 338, Ex. 1; Tr. at 104. In hindsight, there is no question that Mr. Greenwell should have done more or should have refused the funds without further explanation—especially since the method of payment was not ordinary business practice. The Court, however, is not clearly convinced that Mr. Greenwell reviewed an order of the Court—actual notice—and then explicitly disregarded its terms. Without Madison Capital presenting such convincing evidence, Mr. Greenwell cannot be held in contempt.

### III. Appropriate sanctions

"Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947); *cf. Elec. Workers*, 340 F.3d at 379. Here, the goal of the sanction is to coerce Mr. Smith to comply with this Court's orders.

"The district court has inherent authority to fashion the remedy for contumacious conduct." *United States v. Conces*, 507 F.3d 1028, 1043-44 (6th Cir. 2007) (quoting *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 557 (6th Cir. 2006)). Sanctions associated with civil contempt can range from dismissing counterclaims to imprisonment. Madison Capital asks to receive the $161,434.85 as a sanction. Absent Smith's wrongful conduct, however, Madison Capital would never have been entitled to these funds. No one disputes that Community Trust Bank issued the

cashier's checks to Magic Coal by mistake. Without explaining the details, the parties stated at the hearing that Community Trust Bank actually owed this money to the Justice Cabinet but disbursed these refunds to Magic Coal instead. Tr. at 27. Even if the checks had rightfully been Magic Coal's property, the funds would not have made it from Magic Coal to Mr. Smith to Madison Capital. Magic Coal had other debtors and did not owe Madison Capital payment directly. *Id.* at 26-28. Thus, had there been no wrongdoing, the money would have been either returned to Community Trust Bank or distributed to Magic Coal's creditors. Under no proper scenario would it become Madison Capital's property.

Madison Capital also asks the Court to dismiss Mr. Smith's counterclaims as a sanction. Courts utilize this remedy to punish parties that violate discovery requests. *See* Fed. R. Civ. P. 37(d); *Mitan v. Int'l Fidelity Ins. Co.*, 23 F. App'x 292, 297 (6th Cir. 2001) ("This court long has recognized that a trial court's inherent power includes the power to dismiss cases involving flagrant abuses." (citing *Reid v. Prentice-Hall, Inc.*, 261 F.2d 700, 701 (6th Cir. 1958))). Dismissal would be too harsh of a sanction in this instance. "Mindful of the strong policy that cases be decided on the merits, and that dismissal without deciding the merits is the most extreme sanction, a court must [ ] exercise its inherent power to dismiss with restraint." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993). Further, as a sanction, dismissal of the counterclaims is not sufficiently tied to Mr. Smith's wrongful conduct. When the court dismisses a plaintiff's claims for discovery violations, it is a response to a plaintiff's failure to cooperate in pursuit of his own action. Although Mr. Smith has been an uncooperative defendant, he retains the right to bring his claims as a plaintiff and have his own day in court. Mr. Smith's right to pursue his counterclaims has nothing to do with his attempts to evade payment to Madison Capital.

Like this Court, Madison Capital simply wants Mr. Smith to comply with the Court's orders. The proper sanction, then, is for Mr. Smith to pay Madison Capital's fees for seeking contempt. If Mr. Smith follows the orders of the Court, Madison Capital will have a chance to collect on its judgment against him. This sanction is also directly related to Mr. Smith's misconduct. By filing and litigating this contempt motion, Madison Capital provided the mechanism for the Court to compel Mr. Smith to obey its orders. Mr. Smith is responsible for the fees Madison Capital incurred because without his defiance of the Court, there would have been no need for a contempt motion. The sanction may also serve as an offset for any money that Mr. Smith may gain in the upcoming lawsuit on his counterclaims.

Madison Capital also proposes disgorgement of the $161,434.85 from Mr. Greenwell. "Federal courts may order equitable relief against [such] a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *See S.E.C. v. George*, 426 F.3d 786, 798 (6th Cir. 2005) (quoting *S.E.C. v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998))). To have no legitimate claim to the funds means, in the securities context, that an individual "gave no consideration for the [ ] shares and thus received them as a gift." *Cavanaugh*, 155 F.3d at 137. Mr. Greenwell has a legitimate claim to some of the funds—those he already incurred representing Mr. Smith. He has given consideration for that money by providing legal services since October 2008. But Mr. Greenwell must account for any funds that remain. The Court will then determine who has the primary claim to the money, whether it be Magic Coal or Community Trust Bank. To hold otherwise would allow Mr. Smith to continue to reap the benefits of his disregard for the Court's orders.

16

Obviously, this is a severe, but not the most severe, sanction the Court could employ. Hopefully, the amount of the sanction will compel Mr. Smith to follow court orders in the future. His failure to follow further orders of the Court will result in sanctions much more severe including dismissal of his claims against Madison Capital.

## CONCLUSION

Accordingly, it is **ORDERED** as follows:

(1) Madison Capital's motion for contempt, R. 326, is **GRANTED IN PART** as to Timothy Smith but **DENIED IN PART** as to Charles Greenwell.

(2) As sanction, Mr. Smith will pay Madison Capital's fees for litigating this contempt motion. Madison Capital must submit cost and bills by **Monday, March 15, 2010**.

(3) Mr. Greenwell must submit to the Court an accounting of any funds that remain from the $161,434.85 retainer by **Monday, March 15, 2010.**

(4) Mr. Smith's counterclaims against Madison Capital remain pending. The telephonic final pretrial conference, R. 346, remains scheduled for **Friday, March 19, 2010**.

(5) An additional telephonic conference is set for **Monday, March 8, 2010,** at **3:00 p.m.** The undersigned's chambers will initiate the conference call. A court reporter is needed and will be provided by the Court.

This the 4th day of March, 2010.

Signed By:
_Amul R. Thapar_ AT
United States District Judge